# IN THE UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLUBCOM, INC., | ) | Case No. 2:07-CV-01462-TFM |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. Terrence F. McVerry |
| v. | ) | |
| | ) | |
| CAPTIVE MEDIA, INC. | ) | |
| d/b/a HEALTH CLUB PANEL NETWORK | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |
| | ) | |
| CM SHAREHODLER HOLDINGS, INC., | ) | |
| f/k/a/ CAPTIVE MEDIA, INC., | ) | |
| d/b/a HEALTH CLUB PANEL NETWORK, a | ) | |
| California Corporation, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLUBCOM, INC., a Delaware Corporation; | ) | |
| PRECOR, INC., a Delaware Corporation; and | ) | |
| AMER SPORTS OJY a/k/a AMER SPORTS | ) | |
| CORPORATION, organized under the laws of | ) | |
| Finland, | ) | |
| | ) | |
| Counterdefendants. | ) | |
| ——————————————— | ) | |

## ANSWER AND COUNTERCLAIMS

## ANSWER

Defendant and counter-claimant CM Shareholder Holdings, Inc. ("CM"), f/k/a Captive Media, Inc., answers the complaint ("Complaint') filed by plaintiff and counterdefendant ClubCom, Inc. ("ClubCom") as follows:

1

1.      As to the allegations in paragraph 1 of the Complaint, the agreement speaks for itself.  To the extent the allegations in paragraph 1 go beyond the scope of the agreement, CM denies them.

2.      In response to the allegations in paragraph 2 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

3.      As to the allegations in paragraph 3 of the Complaint, CM admits that ClubCom is a Delaware corporation and that it operates a closed-circuit entertainment network broadcasting music videos and ambient sound in health clubs and bowling alleys in the United States, Australia, Japan and the United Kingdom.  CM denies the remaining allegations in paragraph 3 of the Complaint.

4.      CM admits the allegations of paragraph 4 of the Complaint.

5.      In response to the allegations in paragraph 5 of the Complaint, CM admits that, prior to the Agreement, it entered into agreements with advertisers and advertising agencies to provide various forms of advertising in approximately 2,500 health clubs throughout the United States with which CM had license agreements.

6.      In response to the allegations of paragraph 6 of the Complaint, CM admits that it did not operate a closed-circuit entertainment network providing music videos and ambient sound prior to the Agreement.

7.      Paragraph 7 of the Complaint contains contentions of law, to which CM is not obligated to respond.

8.      CM denies the allegations in paragraph 8 of the Complaint.

9.      Paragraph 9 of the Complaint contains contentions of law, to which CM is not obligated to respond.  CM denies that it has breached the agreement or engaged in any of the wrongful acts alleged in the Complaint.  CM denies that ClubCom has the right to terminate the agreement and specifically denies that ClubCom has been damaged in any manner or amount.

10.    As to the allegations in paragraph 10 of the Complaint, CM admits that ClubCom is a Delaware corporation and that it operates a closed-circuit network broadcasting music videos and ambient sound in health clubs and bowling alleys in the United States, Australia, Japan and the United Kingdom. CM denies the remainder of the allegations in paragraph 10 of the Complaint.

11.    In response to the allegations in paragraph 11 of the Complaint, CM admits that, prior to the Agreement, it entered into agreements with advertisers and advertising agencies to provide various forms of advertising, internal messaging, promotional materials, and sampling in approximately 2,500 health clubs throughout the United States with which CM had license agreements.

12.    In response to the allegations in paragraph 12 of the Complaint, CM admits that, prior to the Agreement, it entered into agreements with advertisers and advertising agencies to provide various forms of advertising, internal messaging, promotional materials, and sampling in approximately 2,500 health clubs throughout the United States with which CM had license agreements.

13.    In response to the allegations of paragraph 13 of the Complaint, CM admits that it did not operate a closed-circuit entertainment network providing music videos and ambient sound prior to the Agreement.

14.    In response to the allegations in paragraph 14 of the Complaint, CM admits that, on or about December 6, 2005, Paul J. Byrne, the President of Precor, signed the agreement of behalf of ClubCom, Inc., that CM's President, Eugene Lederer, signed the agreement on the same date, and that the agreement is dated as of March 7, 2006.

15.    As to the allegations in paragraph 15 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 15 go beyond the scope of the agreement, CM denies them.

16.    In response to the allegations of paragraph 16 of the Complaint, CM admits that ClubCom engaged in a self-dealing transaction with its President, Tom Lapcevic, by which

ClubCom paid Mr. Lapcevic to obtain certain rights in perpetuity. CM denies the remaining allegations of paragraph 16.

17.    As to the allegations in paragraph 17 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 17 go beyond the scope of the agreement, CM denies them.

18.    As to the allegations in paragraph 18 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 18 go beyond the scope of the agreement, CM denies them.

19.    As to the allegations in paragraph 19 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 19 go beyond the scope of the agreement, CM denies them.

20.    As to the allegations in paragraph 20 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 20 go beyond the scope of the agreement, CM denies them.

21.    As to the allegations in paragraph 21 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 21 go beyond the scope of the agreement, CM denies them.

22.    As to the allegations in paragraph 22 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 22 go beyond the scope of the agreement, CM denies them.

23.    As to the allegations in paragraph 23 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 23 go beyond the scope of the agreement, CM denies them.

24.    As to the allegations in paragraph 24 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 24 go beyond the scope of the agreement, CM denies them.

25.    As to the allegations in paragraph 25 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 25 go beyond the scope of the agreement, CM denies them.

26.    As to the allegations in paragraph 26 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 26 go beyond the scope of the agreement, CM denies them.

27.    As to the allegations in paragraph 27 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 27 go beyond the scope of the agreement, CM denies them.

28.    As to the allegations in paragraph 28 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 28 go beyond the scope of the agreement, CM denies them.

29.    As to the allegations in paragraph 29 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 29 go beyond the scope of the agreement, CM denies them.

30.    As to the allegations in paragraph 30 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 30 go beyond the scope of the agreement, CM denies them.

31.    As to the allegations in paragraph 31 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 31 go beyond the scope of the agreement, CM denies them.

32.    As to the allegations in paragraph 32 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 32 go beyond the scope of the agreement, CM denies them.

33.    As to the allegations in paragraph 33 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 33 go beyond the scope of the agreement, CM denies them.

34.    As to the allegations in paragraph 34 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 34 go beyond the scope of the agreement, CM denies them.

35.    CM denies the allegations in paragraph 35 of the Complaint.

36.    CM denies the allegations in paragraph 36 of the Complaint.

37.    In response to the allegations of paragraph 37 of the Complaint, CM admits that, with the knowledge and consent of ClubCom, CM branded its project with ClubCom under the name "HCPN-DB" and, consistent with the operative agreements, undertook efforts to promote the project. Except as so admitted, deny.

38.    CM denies the allegations in paragraph 38 of the Complaint.

39.    In response to paragraph 39 of the Complaint, CM admits that it promoted and marketed HCPN-DB to health clubs at the club industry trade show held in Chicago, Illinois on October 10 through October 13, 2007. CM denies the remainder of the allegations in paragraph 39 of the Complaint.

40.    In response to paragraph 40 of the Complaint, CM admits that it presented promotional literature and proposed legal contracts associated with HCPN-DB to health clubs, but denies that it targeted ClubCom customers for receipt of such materials. CM is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations of paragraph 40 of the Complaint.

41.    CM admits that ClubCom received promotional literature and proposed legal contracts sent by CM and associated with HCPN-DB. However, CM denies the balance of the allegations of paragraph 41.

42.    In response to the allegations in paragraph 42 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

43.    CM denies the allegations in paragraph 43 of the Complaint.

44.    CM denies the allegations in paragraph 44 of the Complaint.

45.    In response to the allegations in paragraph 45 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

46.    CM denies the allegations in paragraph 46 of the Complaint.

47.    As to the allegations in paragraph 47 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 47 go beyond the scope of the agreement, CM denies them.

48.    CM denies the allegations in paragraph 48 of the Complaint.

49.    In response to the allegations in paragraph 49 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

50.    CM denies the allegations in paragraph 50 of the Complaint.

51.    As to the allegations in paragraph 51 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 51 go beyond the scope of the agreement, CM denies them.

52.    CM denies the allegations in paragraph 52 of the Complaint.

53.    In response to the allegations in paragraph 53 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

54.    As to the allegations in paragraph 54 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 54 go beyond the scope of the agreement, CM denies them.

55.    CM denies the allegations in paragraph 55 of the Complaint.

56.    CM denies the allegations in paragraph 56 of the Complaint.

57.    In response to the allegations of paragraph 57 of the Complaint, CM admits that, with the knowledge and consent of ClubCom, CM branded its joint venture with ClubCom under

the name "HCPN-DB" and, consistent with the operative agreements, undertook efforts to promote the project.

58.    CM denies the allegations in paragraph 58 of the Complaint.

59.    In response to the allegations in paragraph 59 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

60.    In response to the allegations in paragraph 60 of the Complaint, CM admits that Gold's Gym directly owns approximately 66 health clubs and, in addition, enters into franchise agreements with franchisees throughout the United States and internationally.  CM also admits that ClubCom and CM both had long term agreements with Gold's Gym International.

61.    In response to the allegations in paragraph 61 of the Complaint, CM admits that ClubCom and CM have both had long term agreements with Gold's Gym International, that ClubCom informed CM of its agreement with Gold's Gym International, and that ClubCom twice requested that CM contact Gold's Gym International to help ClubCom preserve its relationship with Gold's Gym International.  CM denies the remaining allegations of paragraph 61 of the Complaint.

62.    In response to the allegations in paragraph 62 of the Complaint, CM admits that a common franchisee owns Gold's Gym facilities in Newberg, Fishkill, LaGrange and Poughkeepsie, New York and that such franchisee has been a customer of both ClubCom and CM since at least 2006.  As to the remaining allegations of paragraph 62, the agreement speaks for itself.  To the extent that the remaining allegations in paragraph 62 go beyond the scope of the agreement, CM denies them.

63.    CM denies the allegations in paragraph 63 of the Complaint.

64.    In response to the allegations in paragraph 64 of the Complaint, CM admits that it attempted to enter into agreement with the Gold's Gym Titusville franchisee.  The agreement speaks for itself.  To the extent the allegations in paragraph 64 go beyond the scope of the agreement, CM denies them.

65.    In response to the allegations in paragraph 65 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

66.    CM denies the allegations in paragraph 66 of the Complaint.

67.    As to the allegations in paragraph 67 of the Complaint, the agreement speaks for itself.  To the extent the allegations in paragraph 67 go beyond the scope of the agreement, CM denies them.

68.    CM admits the allegations in paragraph 68 of the Complaint.

69.    CM denies the allegations in paragraph 69 of the Complaint.

70.    In response to the allegations in paragraph 70 of the Complaint, CM admits that ClubCom introduced a representative of CM to a representative of the JCC and that one purpose of the introduction was to discuss panel advertisements, promotional opportunities and various marketing opportunities.  CM denies the remaining allegations in paragraph 70 of the Complaint.

71.    CM denies the allegations in paragraph 71 of the Complaint.

72.    In response to the allegations in paragraph 72 of the Complaint, CM denies that it disseminated misleading promotional material.  CM is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegations in paragraph 72 of the Complaint, and, on that basis, denies such allegations.

73.    CM denies the allegations in paragraph 73 of the Complaint.

74.    In response to the allegations in paragraph 74 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

75.    CM denies the allegations in paragraph 75 of the Complaint.

76.    In response to the allegations of paragraph 76 of the Complaint, CM admits that Fitworks operates health club facilities in the State of Ohio and that, prior to the Agreement, (i) ClubCom's Network was installed in four Fitworks locations and (ii) CM had a license agreement for all eighteen Fitworks locations.  As to the remaining allegations of paragraph 76

of the Complaint, the agreement speaks for itself.  To the extent the remaining allegations of paragraph 76 go beyond the scope of the agreement, CM denies them.

77.     CM denies the allegations in paragraph 77 of the Complaint.

78.     In response to the allegations in paragraph 78 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

79.     CM denies the allegations in paragraph 79 of the Complaint.

80.     CM denies the allegations in paragraph 80 of the Complaint.

81.     In response to the allegations in paragraph 81 of the Complaint, CM incorporates its responses to all preceding paragraphs as if fully set forth herein.

82.     Paragraph 82 of the Complaint contains contentions of law, to which CM is not obligated to respond.

83.     In response to the allegations in paragraph 83 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

84.     In response to the allegations in paragraph 84 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

85.     CM admits the allegations of paragraph 85 of the Complaint.

86.     Paragraph 86 of the Complaint contains contentions of law, to which CM is not obligated to respond.

87.     Paragraph 87 of the Complaint contains contentions of law, to which CM is not obligated to respond.

88.     In response to the allegations in paragraph 88 of the Complaint, CM incorporates its responses to all preceding paragraphs as if fully set forth herein.

89.     As to the allegations in paragraph 89 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 89 go beyond the scope of the agreement, CM denies them.

90.     In response to the allegations in paragraph 90 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

91.     CM denies the allegations in paragraph 91 of the Complaint.

92.     In response to the allegations in paragraph 92 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

93.     CM denies the allegations in paragraph 93 of the Complaint.

94.     In response to the allegations in paragraph 94 of the Complaint, CM incorporates its responses to all preceding paragraphs as if fully set forth herein.

95.     CM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 of the Complaint and, on that basis, denies such allegations.

96.     As to the allegations in paragraph 96 of the Complaint, the agreement speaks for itself. To the extent the allegations in paragraph 96 go beyond the scope of the agreement, CM denies them.

97.     In response to the allegations in paragraph 97 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

98.     In response to the allegations in paragraph 98 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

99.     In response to the allegations in paragraph 99 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

100.    CM denies the allegations in paragraph 100 of the Complaint.

101.    CM denies the allegations in paragraph 101 of the Complaint.

102.    In response to the allegations in paragraph 102 of the Complaint, CM incorporates its responses to all preceding paragraphs as if fully set forth herein.

103.    CM is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 of the Complaint and, on that basis, denies such allegations.

104.    As to the allegations in paragraph 104 of the Complaint, the agreement speaks for itself.  To the extent the allegations in paragraph 104 go beyond the scope of the agreement, CM denies them.

105.    In response to the allegations in paragraph 105 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

106.    In response to the allegations in paragraph 106 of the Complaint, CM denies each and every averment therein contained, and specifically denies that ClubCom has been damaged or injured in any manner or amount.

107.    CM denies the allegations in paragraph 107 of the Complaint.

108.    With respect to the allegations, if any, of paragraphs 1 through 107 of the Complaint which have not been admitted or denied by paragraphs 1 through 107 of this Answer, CM denies each and every such allegation.

## FIRST AFFIRMATIVE DEFENSE

(Unclean Hands)

109.    ClubCom's claims are barred by the doctrine of unclean hands.

## SECOND AFFIRMATIVE DEFENSE

### (Estoppel)

110.    By reason of ClubCom's actions and failures to act, and by reason of CM's reasonable reliance on these actions and inactions, ClubCom is estopped from raising each and every claim set forth in the Complaint.

## THIRD AFFIRMATIVE DEFENSE

### (Waiver)

111.    By reason of ClubCom's actions and failures to act, ClubCom has waived and released any rights that it may have had against CM and, by reason thereof, ClubCom is barred from the recovery sought in the Complaint.

## FOURTH AFFIRMATIVE DEFENSE

### (Laches)

112.    ClubCom's claims are barred by the doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

### (ClubCom's Negligence/Culpability)

113.    In connection with the allegations set forth in the Complaint, ClubCom was negligent or otherwise culpable and its negligence or culpability proximately caused and contributed to it purported injuries, if any, and, accordingly, reduces or bars any recovery by him.

## SIXTH AFFIRMATIVE DEFENSE

### (Excuse)

114.    CM's obligations to ClubCom are excused by ClubCom's material breaches of the March 7, 2006 Advertising Rights License Agreement and the March 7, 2006 Letter Agreement Regarding CM Facilities.

## SEVENTH AFFIRMATIVE DEFENSE

### (Privilege)

115.    CM's actions, as alleged in the Complaint, were privileged, among other things, by CM's right to engage in lawful business activities, by California Business and Professions Code 16600, and by the First Amendment of the United States Constitution.

## EIGHTH AFFIRMATIVE DEFENSE

### (Offset)

116.    ClubCom's damages, if any, must be offset by the damages CM has suffered by reason of ClubCom's wrongful conduct.

## NINTH AFFIRMATIVE DEFENSE

### (Failure To Mitigate Damages)

117.    ClubCom failed to mitigate its damages.

## TENTH AFFIRMATIVE DEFENSE

### (Speculative Damage)

118.    The damages claimed by ClubCom are speculative.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Additional Defenses)

119.    CM may have additional affirmative defenses of which it is not fully aware. Accordingly, CM reserves the right to assert additional affirmative defenses after they are ascertained.

WHEREFORE, CM, having fully answered ClubCom's Complaint, requests judgment be entered dismissing Plaintiff's Complaint in its entirety with prejudice, and awarding CM its costs and attorneys' fees, and granting such other and further relief as appropriate.

Dated:  May 22, 2008

Respectfully submitted,

STRASSBURGER McKENNA GUTNICK & GEFSKY

By: /s/ David A. Strassburger
    David A. Strassburger
    Pa. I.D. No. 76027

    Four Gateway Center, Suite 2200
    444 Liberty Avenue
    Pittsburgh, PA 15222
    (412) 281-5423
    Counsel for Defendant and
    Counterclaimant

**JURY TRIAL DEMANDED**

Louis P. Petrich
Vincent Cox
Leopold, Petrich & Smith,
A Professional Corporation
2049 Century Park East, Suite 3110
Los Angeles, California  90067
Tel:  (310) 277-3333
Fax:  (310) 2777-7444
Email:  lpetrich@lpsla.com
        vcox@lpsla.com
Attorneys for CM SHAREHOLDER
HOLDINGS, INC., f/k/a/ CAPTIVE MEDIA,
INC.

Defendant and Counterclaimant CM Shareholder Holdings, Inc. ("CM"), f/k/a Captive Media, Inc. alleges the following with personal knowledge as to it own acts, and on information and belief as to all other matters:

## COUNTERCLAIMS

## OVERVIEW

1.       CM provides advertising space to advertisers and advertising agencies in over 2,500 health clubs with which CM has license agreements.  Plaintiff and Counterdefendant ClubCom, Inc. ("ClubCom") broadcasts music programming and communication access for distribution over a closed circuit network in approximately 600 health clubs and bowling alleys (the "Network").  Representatives of ClubCom, Counterdefendant Precor, Inc. ("Precor") (ClubCom's immediate parent), and Counterdefendant Amer Sports Ojy a/k/a Amer Sports Corporation ("Amer") (corporate owner of both Precor and ClubCom) approached CM with a proposal to enter into a joint venture, by which CM would obtain the exclusive right to place national advertisements on ClubCom's Network.  In exchange, ClubCom would receive 20% of the revenue generated by the advertisements.  In addition, ClubCom and CM would embark on a strategic partnership to expand their respective services in health clubs throughout the fitness industry.

2.       The parties memorialized these terms in an Advertising Rights License Agreement and a Letter Agreement Regarding CM Facilities, both dated as of March 7, 2006 (the "Agreements").  Pursuant to the Agreements, CM paid ClubCom an advance of $1,000,000, which ClubCom agreed to repay through its share of future advertising royalties.  The Agreements were to last until June 30, 2016.

3.       Almost from the beginning, ClubCom began breaching its obligations under the Agreements.  Among other things, ClubCom:

- • Failed to fulfill orders to place advertisements on the ClubCom Network;

- • Failed to install the ClubCom network in hundreds of health clubs to which CM introduced it;

- • Refused to invest funds to maintain and upgrade its equipment, as required by the Agreements, on the grounds that Amer refused to provide such funds; and

- Actively discouraged clubs with which ClubCom had relationships to do business with CM by means of, among other things, false and disparaging statements concerning CM and its representatives.
- Failed to promote CM's capabilities within the fitness industry;
- Failed to make meaningful efforts to obtain advertising rights for CM in health clubs with which ClubCom had business relationships;
- Misrepresented the costs needed to redress deficiencies in its Network or to install the Network in new facilities;
- Failed to include CM or its capabilities in ClubCom's marketing efforts;
- Failed to dedicate personnel to implement the Agreements;
- Met with CM's competitors to discuss doing business together.

4.      Unbeknownst to CM when the Agreements were executed, ClubCom's management was incapable of profitable operation and Counterdefendants were looking to "unload" the company. In searching for an acquisition, ClubCom (on behalf of itself and the other Counterdefendants) approached CM and at least one of CM's competitors, but has been unable to find a buyer.

5.      In November 2007, ClubCom's president contacted CM to complain that CM had distributed information to potential investors without attempting to solicit a joint sale of CM and ClubCom assets. CM introduced ClubCom to an investment banker so that ClubCom (and the other Counterdefendants) could attempt to find a separate buyer for their ClubCom assets.

6.      In response, without warning and in utter disregard of the procedures for addressing claims of breach, on November 14, 2007, ClubCom announced that it was unilaterally terminating the Agreements because of CM's supposedly "incurable" breaches and would bring suit against CM. ClubCom based its action on specious accusations that CM was selling a "competing" network, and that it had supposedly failed to use its "best efforts" to perform the Agreements. Such accusations are absolutely false and, in any event, do not provide contractual grounds for ClubCom's actions.

7.    During the nearly two years since the Agreements were signed, ClubCom had never voiced any criticism of CM's performance, and ClubCom's pretextual "termination" was a transparent attempt by Counterdefendants to disrupt any potential sale of CM's assets and to extort CM into arranging an acquisition of ClubCom's failed business.

8.    Unfortunately for Counterdefendants, their ploy failed.  Even with the Agreements having been terminated, and with the cloud of dubious litigation, CM was able to sever its contractual relationship with ClubCom from its remaining assets and find a buyer for such asets -- albeit at a substantially reduced sales price.

9.    At present, ClubCom, and the other Counterdefendants, holds $907,916.13 of unearned advance royalties belonging to CM.  ClubCom has also cut off CM's access to portions of the ClubCom website necessary to perform the parties' agreements.  Further, ClubCom has provided no assurance that it will run the ads that CM has placed, and continues to place, for its advertising clientele.  Moreover, in violation of the exclusive license lying at the core of the Agreements, ClubCom is actively seeking national advertisements from sources other than CM.

10.    As a result of these actions, and others, CM faces ongoing and irreparable harm to its relationship with advertising agencies, with the health clubs from which it licenses the right to place advertisements and with prospective investors in CM's assets.  In addition, ClubCom's breaches and misconduct have subjected CM to substantial economic losses and will continue to do so during the more than eight years remaining under the Agreements.

## THE PARTIES

11.    CM is a California corporation with its principal place of business at 17835 Ventura Boulevard, Suite 100, Encino, California.  CM has signed licensing agreements with over 2,500 health clubs to place advertisements in the clubs.  CM focuses on indoor billboards, including panels and electronic/digital signage (*i.e.,* electronic signage displayed on flat-screen monitors with no sound), and marketing activities such as the placement of coupons, branded yoga mats, and other forms of advertisements placed within health clubs.

12.     Amer is a Finnish "Osakeyhtiö" ("stock company") with its principal place of business at Makelankatu 91, Helsinki, Finland.  Amer is a publicly-traded multinational corporation that touts itself as the world's largest sporting goods company, with more than 6,000 employees and worldwide annual net sales in excess of $2 billion.  Amer maintains manufacturing and distribution sites around the world, and markets its products in virtually every jurisdiction in the United States, through various divisions and/or subsidiaries, including Wilson Sporting Goods (sporting goods and apparel), Salomon (skiing and mountaineering gear) and Atomic (skiing and snowboarding equipment), as well as Precor and ClubCom.

13.     Precor is a Delaware corporation with its principal place of business at 20031 142nd Ave. NE, Woodinville, Washington.  Precor is a wholly-owned subsidiary of Amer, which touts Precor as "the global fitness equipment leader."  Precor markets "high-end" home and commercial fitness equipment through a network of dealers throughout the United States and around the world.

14.     ClubCom is a Delaware corporation headquartered at 20031 142nd Ave. NE, Woodinville, Washington, with a principal place of business at 100 Business Center Drive, Pittsburgh, Pennsylvania.  ClubCom is a wholly-owned subsidiary of Precor and, in turn, of Amer.  ClubCom produces advertising and broadcasts music programming and offers communication access for distribution over a closed circuit network in approximately 600 health clubs and bowling alleys.

15.     Except when ClubCom entered into the written agreement at issue, at all times mentioned herein subsequent to the written agreement each of the Counterdefendants was agent and/or co-conspirator of each of the other Counterdefendants, and in doing the things herein alleged was acting within the scope of its authority as such agent and/or co-conspirator and with the permission and consent of each of the other Counterdefendants.

## JURISDICTION AND VENUE

16.     All three counterdefendants engage in substantial, continuous and systematic commercial activities in the Commonwealth of Pennsylvania, including by maintaining,

soliciting and making substantial sales in the state by and through their national distribution networks.

17.    Further, ClubCom has consented to the personal jurisdiction of this court, on behalf of itself and its principals and co-conspirators Amer and Precor, by bringing suit in the Western District of Pennsylvania and vigorously pursuing its claims before this court. Additionally, ClubCom, on behalf of itself and its principals and co-conspirators Amer and Precor, has waived any objection the venue by bringing suit in the Western District of Pennsylvania.

## AGREEMENTS

18.    Commencing in approximately 2004, executives from ClubCom, Precor, and Amer approached CM with the proposal to enter into a joint venture by which CM would sell advertisements for display on ClubCom's closed-circuit entertainment network in health clubs under contract with ClubCom.  ClubCom's president, Tom Lapcevic, assured CM that the venture would be highly profitable, especially because ClubCom's network ran in TSI health clubs in Manhattan, which were frequented by advertising executives and their personnel. Further, Mr. Lapcevic assured CM that the project had full commitment from Precor and Amer, and that ClubCom would be able to install the Network in thousands of health clubs with which CM had pre-existing license agreements, thereby providing CM an opportunity to substantially increase the revenues it received from advertisers.

**The License Agreement**

19.    On December 7, 2005, ClubCom and CM executed an Advertising Rights License Agreement, with an effective date of March 7, 2006 (the "License Agreement").  The purpose of the License Agreement was "to provide CM with certain rights regarding the commercialization of advertising and promotional activities over the ClubCom network in health clubs in the United States and Canada."  Specifically, ClubCom granted CM "an exclusive license to market,

promote, commercialize and sell Licensed Advertisements to National Advertisers" over ClubCom's network.

20.    Because much of ClubCom's equipment and technology were out of date, ClubCom and CM each agreed to pay a substantial amount "for the purpose of installing a network server and satellite system" in each of 400 key facilities and substantial additional monies in each such facility "for the procurement and installation of two monitors for the purpose of broadcasting the network" in each facility. In addition, ClubCom and CM each agreed to pay substantial additional amounts "for the installation of multiple video output cards" and "for the procurement and installation of two facility screens" at each of the TSI facilities in Manhattan.

21.    The term of the License Agreement was ten and one-half years, ending on June 30, 2016. The agreement could not be terminated earlier, except; (a) in the event of bankruptcy, (b) if "the other party breaches its obligations hereunder in any material respect and such breach is either not curable or is not cured within sixty (60) days of written notice thereof from the other party" or (c) on 20 days' written notice in the case of unpaid royalties or other monies. The parties agreed "to cooperate in the performance of the transactions contemplated by this Agreement, including but not limited to the execution of any future documents and agreements necessary or advisable to carry out the intent of the parties in connection with this Agreement."

22.    Pursuant to the License Agreement, CM paid ClubCom an "advance royalty credit against percentage royalties" in the amount of $1 million. ClubCom agreed to repay this amount over the first five and one-half years of the License Agreement from advertising royalties it was to receive. At present, ClubCom's share of earned royalties is $92,083.87, leaving a balance of $907,916.13.

**The Letter Agreement**

23.    On March 8, 2006, ClubCom and CM entered into a Letter Agreement Regarding CM Facilities (the "Letter Agreement"), reflecting "certain supplemental understandings" concerning the parties' relationship.

24.    In the Letter Agreement, CM agreed to help ClubCom install the Network in facilities with which CM had advertising rights, "pursuant to terms and conditions that are mutually acceptable to ClubCom and CM." In exchange, ClubCom agreed to "use commercially reasonable efforts to install, operate and commercialize the Network" in such health clubs. In addition CM and ClubCom agreed "to work together and to use their best efforts to secure the right for ClubCom to install, operate commercialize the Network, and CM to receive advertising rights in health clubs with which neither party had agreements, throughout the United States and Canada."

## AMER AND PRECOR'S INVOLVEMENT IN OVERSEEING CLUBCOM'S ABORTIVE PERFORMANCE

25.    Executives from ClubCom's parent companies, Amer and Precor, played leading roles in overseeing the negotiation of the License Agreement and the Letter Agreement, and ClubCom's abortive performance thereunder.

26.    Paul Byrne is and was at all times relevant hereto, Precor's President and, as such, serves on Amer's eight-member "Executive Board." Mr. Byrne was CM's primary point of contact and negotiating partner with respect to the License Agreement spoke with CM representatives hundreds of times in order to negotiate the agreement. Mr. Byrne traveled to CM's offices in Encino, California during negotiation of the agreements and signed the License Agreement on ClubCom's behalf.

27.    Raymond Berens is and was at all times relevant hereto, Precor's Secretary and General Counsel. Mr. Berens also traveled to CM's offices in Encino, California during negotiation of the agreements and signed the Letter Agreement on ClubCom's behalf. Mr.

Berens represented to CM that he was on Amer's Board of Directors and held himself out as an agent of Amer.

28.    Both the License Agreement and the Letter Agreement guaranteed special advertising rights to Amer and contained provisions expressly intended to benefit Precor. The License Agreement authorized Precor and Amer to issue "reasonable instructions regarding the operation of the Network, and advertising over the Network."

29.    As set forth below, ClubCom management conceded that Amer had the "final word" on any expansion of ClubCom's capabilities and whether to inject capital into ClubCom's business operations.

## CM'S PERFORMANCE

30.    Promptly upon execution of the agreements, CM developed, and ClubCom approved, promotional materials branding the parties' joint venture, including the Network, under the name "HPCN-DB." CM described the joint venture in a press release, in marketing materials, and its website, and in direct mailings to thousands of health clubs, including all of the health clubs with which it held license agreements. These promotional materials included graphics developed by ClubCom and touted the benefits of the ClubCom Network.

31.    CM has mailed out marketing materials, provided by ClubCom, to all of the health clubs with which CM holds license agreements. In addition, CM's sales force described the joint venture with CM in one-on-one presentations with advertising agencies and health clubs.

32.    Before ClubCom refused to accept further ads from CM, CM had submitted more than $460,000 worth of advertisements, with revenues steadily rising.

33.    In addition, CM routinely introduced ClubCom sales personnel and executives to representatives of the health clubs with which CM held exclusive license agreements. CM has provided ClubCom with the opportunity to place its network in more than five hundred health clubs with which CM held license agreements.

## CLUBCOM'S INABILITY AND REFUSAL TO PERFORM

34.    In contrast to CM's efforts, ClubCom has fallen far short of honoring its commitments. ClubCom has routinely failed to fulfill advertising insertion orders CM has placed, resulting in substantial losses of revenue and damage to CM's reputation and goodwill with advertising agencies.

35.    In addition, soon after the agreements were signed, ClubCom announced that it would not fund upgrades to its Network within key facilities, as required by the License Agreement, because Amer had not allocated sufficient funds for this purpose.

36.    ClubCom lacks the means to transmit new content electronically to many of the clubs within its network, relying instead on DVDs delivered physically to club locations. ClubCom routinely failed to cause the insertion of updated DVDs containing new advertisements.

37.    Faced with ClubCom's inadequate infrastructure and its refusal to finance the capital improvements required by the License Agreement, CM has offered to fund more than its share of the improvements and to assume responsibility for delivering DVDs containing current advertisements. ClubCom refused such offers, although it eventually allowed CM, at its own expense to update some of the DVDs.

38.    ClubCom has failed to follow up the introductions to health clubs that CM has made, and the opportunities to expand the Network that CM has presented. To date, ClubCom has installed its Network in only six of the more than five hundred of health clubs CM has made available.

39.    While CM has gone to great lengths to promote ClubCom's Network, ClubCom has refused to promote CM's services or do anything else to expand the number of clubs in which CM can place signage or conduct other advertising activities. To the contrary, ClubCom has induced CM to refrain from promoting itself to certain clubs, falsely promising to act on CM's behalf.

40.     Worse still, ClubCom has disparaged CM, its personnel and its services.  In a February 20, 2007, email to a health club with which CM was seeking to establish a relationship, a ClubCom representative described CM's venue relations director as "incredibly annoying and pushy" and claimed that she "doesn't understand how to conduct business in the South." ClubCom's representative advised the health club's representative that, in health clubs utilizing CM's advertisements, "the club can look junky, the boards get stale very quickly[,] . . . they don't switch them out quickly enough and . . . consistency is a concern."  When apprised of such communications, Paul Byrne refused to take action to remedy the damage caused by such statements, claiming that it was "not important" to him.

41.     CM has often tried to raise its concerns with ClubCom, without success. ClubCom repeatedly has failed to respond to CM's communications and has done nothing to improve its performance under the agreements or to address CM's concerns.

## COUNTERDEFENDANTS' PRETEXTUAL TERMINATION OF CONTRACT AND INTERFERENCE IN CM ACQUISITION

42.     Counterdefendants were well-aware of ClubCom's inability to perform under the Agreements.  In fact, soon after the Agreements were signed, Precor's President, Paul Byrne, complained to Michael Lederer and Eugene Lederer that Mr. Lapcevic did not know how to generate a profit for ClubCom and he told them that he was thinking of selling ClubCom. Thereafter, Mr. Lapcevic suggested to Michael Lederer and Eugene Lederer that ClubCom and CM join together to seek a buyer for the assets of combined companies with ownership of the combined assets to be shared equally.  ClubCom invited CM to join in a meeting with an investment banker and ClubCom's digital consultant to be held in Marina del Rey.  At that meeting Michael Lederer explained that CM needed ClubCom's cooperation in opening up more of CM's clubs to ClubCom's network installation.  Mr. Lederer even offered to assume a larger share of the installation costs with a comparable benefit to CM.  Mr. Lapcevic declined these suggestions.  He admitted that Amer had failed to respond to his requests to fund a large active

expansion and he said that he could not foresee ClubCom being able to participate in installing more than 30 health clubs per month, if that. Mr. Lapcevic advised that such financial constraints were the reason for seeking to sell the combined company as he did not foresee Amer funding a robust expansion for ClubCom. The meeting concluded without any plan for the parties to join together in a sale.

43.    Counterdefendants continued to pursue a disposition of ClubCom, without success. They had discussions with CM's primary digital competitor, Ideacast without advising or inviting CM. In the meantime, CM reviewed ClubCom's financial data and business operations, and concluded that a combined asset sale would not benefit CM.

44.    In 2007, CM began exploring a sale of its own assets. Shortly after CM began this process, Mr. Lapcevic called Michael Lederer and said in an agitated manner that he knew that CM had distributed an informational memorandum to prospective investors in which ClubCom assets were not included. Michael Lederer acknowledged that Mr. Lapcevic was correct and offered to introduce Mr. Lapcevic to CM's investment banker to help ClubCom in obtaining a purchaser. Mr. Lapcevic accepted and Michael Lederer caused Jim Johnsen of JFCo to have a conference call with Mr. Lapcevic. The next thing that occurred was that CM received a notice of default from ClubCom followed by a complaint.

45.    On November 14, 2007, without warning, Mr. Berens sent CM a letter claiming that CM had committed "egregious and irreparable defaults" of the License Agreement by failing to use its best efforts to promote ClubCom and by allegedly promoting a competing network. Mr. Berens announced that ClubCom considered the agreement to be terminated and that ClubCom had filed suit against CM. Thereafter, ClubCom cut off CM's access to portions of the ClubCom website necessary for CM to continue to promote the Network and to honor its commitments to existing advertisers. In addition, ClubCom has failed to provide assurance that it will run new advertisements that CM places on the Network, or that it will continue to run existing advertisements, as agreed.

46.    As a result of these actions, CM can no longer effectively market the Network. Further, because all of CM's marketing efforts include the Network and the packages of services that CM offers, ClubCom's actions have caused, and continue to cause, irreparable injury to CM's business and to its relationship with existing and prospective advertisers, their ad agencies and health clubs.

47.    The unjustified, unilateral "termination" of the Agreements was a transparent ploy by Counterdefendants to interfere in any potential sale of CM's assets and attempt to interject ClubCom's failing business into any such sale. This artifice failed: CM was able to sever its business relationship with ClubCom from its other assets and bring about a sale -- albeit at a substantially discounted sales price.

48.    As a result of Counterdefendants' subterfuge, CM was unable to realize the full enterprise value of its assets. Moreover, ClubCom retains $907,916.13 of unearned royalties provided by CM, and notwithstanding the exclusive advertising rights it has licensed to CM, ClubCom has begun seeking advertisements over its Network directly from advertisers, without sharing any of the revenue with CM. As a result, CM faces the prospect of substantial damages accruing throughout the more than eight years remaining on the Agreements.

**FIRST CLAIM**

**BREACH OF WRITTEN CONTRACT AGAINST ALL DEFENDANTS**

(Against ClubCom)

49.    CM incorporates by reference Paragraphs 1 through 48, as though set forth fully herein.

50.    On or about December 1, 2005 CM and ClubCom entered into the License Agreement. On or about March 8, 2006, CM and ClubCom entered into the Letter Agreement.

51.    CM has performed all its obligations under the License Agreement and the Letter Agreement, except those for which its performance has been excused.

52.     ClubCom breached the License Agreement by, among other things (i) failing to place on the Network, advertisements that CM obtained; (ii) failing to use commercially reasonable efforts to retain and enforce agreements to allow CM to exploit its license to place advertisements in health clubs operating the Network and other clubs; (iii) failing to use commercially reasonable efforts to secure the right to broadcast advertising over the Network at facilities with which ClubCom had agreements; (iv) by failing to fund capital expenditures to install Network servers and television monitors at key facilities and TSI facilities as described by the agreement; (v) failing to cooperate in the performance of the transactions cooperated by the License Agreement; and (vi) purporting to terminate the agreement without cause and without providing CM 60 days written notice of the purported breach for opportunity to cure; (vi) cutting off CM's access to portions of its website necessary for performance of the agreement; (vii) soliciting national advertisements over the Network, in violation of the exclusive license granted to CM; and (viii) inducing CM to defer its own marketing efforts in clubs such as Crunch, by means of false promises that ClubCom would act on CM's behalf.

53.     ClubCom breached the Letter Agreement by, among other things: (a) failing to use commercially reasonable efforts to install, operate and commercialize the Network in a manner required by the Letter Agreement; (b) failing to use its best efforts to secure the right to install, operate and commercialize the Network and to promote CM's rights to advertise in facilities within the fitness industry within the United States and Canada.

54.     As a result of Defendants' breaches of the Agreements, CM has been damaged in an amount to be proven at trial, but not less than $40 million.

**SECOND CLAIM**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

(Against ClubCom)

55.     CM incorporates by reference Paragraphs 1 through 54, as though set forth fully herein.

56.    The Agreements contained an implied covenant of good faith and fair dealing requiring ClubCom to make sufficient efforts to assist CM in placing advertisements over the ClubCom Network, expanding the ClubCom Network to facilities to which CM introduced ClubCom and enabling CM to expand its presence in facilities with which ClubCom had license agreements.

57.    CM has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the contract, except for those excused by ClubCom's breach.

58.    ClubCom breached the implied covenant of good faith and fair dealing in the Agreements by, among other things, failing to place advertisements over the ClubCom Network, failing to expand the ClubCom Network to facilities to which CM introduced ClubCom, failing to enable CM to expand its presence in facilities with which ClubCom had license agreements and even actively interfering with CM"s efforts to perform under the Agreements.

59.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing in the Agreements, CM has suffered damages in an amount to be proven at trial, but not less than $40 million.

### THIRD CLAIM

### INTERFERENCE WITH CONTRACTUAL RELATIONS

(Against All Counterdefendants)

60.    CM incorporates by reference Paragraphs 1 through 59, as though set forth fully herein.

61.    As set forth above, beginning in 2007, CM began exploring a sale of its own assets. CM had a reasonable expectation from obtaining substantial revenue for its assets from strategic investors, which revenues would include a significant component attributable to the value created by the Agreements. Counterdefendants knew of these efforts in that CM informed ClubCom thereof, and, with their purported "termination" of the Agreements and lawsuit,

interfered in an effort to force CM to acquire ClubCom's assets or bring such assets into any such sale. Counterdefendants' actions were intended to, and did, interfere with and prevent CM's ability to sell its assets; CM was forced to sever the Agreements and its business relation with ClubCom in its asset sale and was forced to sell its remaining assets at a substantially discounted price. As a result of this unlawful interference, CM has been damaged in an amount to be proven at trial, but not less than $12 million.

62.    Additionally, pursuant to the Agreements, CM has entered into agreements with advertisers and advertising agencies to place advertisements on ClubCom's Network in exchange for royalty payments (the "Advertiser Transactions"). Counterdefendants knew of the Advertiser Transactions, in that CM submitted the agreements to ClubCom. Counterdefendants interfered with the Advertiser Transactions by failing to run such advertisements and/or telling CM that CM could no longer run such advertisements on the ClubCom Network. Counterdefendants' actions were intended to, and did, interfere with and prevent CM's ability to perform such agreements with advertisers. As a result of Counterdefendants' unlawful interference with the Advertiser Transactions, CM has been damaged in an amount to be proven at trial, but not less than $20 million.

63.    In interfering with CM's asset sale, and with the Advertiser Transactions, Counterdefendants were guilty of fraud, oppression and malice, and outrageous conduct, and CM is entitled to an award of exemplary damages in an amount sufficient to punish Counterdefendants and make an example of them.

64.    Counterdefendants' threatened and ongoing interference with Advertiser Transactions have resulted and will result in great and irreparable injury, for which damages would not afford adequate relief. Therefore the Court should enjoin such interference.

## FOURTH CLAIM

## INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

(Against All Counterdefendants)

65.     CM incorporates by reference Paragraphs 1 through 64, as though set forth fully herein.

66.     CM had a reasonable expectation of economic gain from (i) future agreements with advertisers to place advertisings on the ClubCom Network; (ii) expansion of the ClubCom Network, and the advertising revenues that would follow, into new health club facilities; and (iii) perspective license agreements between CM and facilities with which ClubCom had license agreements; and (iv) expansion into other new facilities.

67.     Counterdefendants knew of these prospective economic opportunities for CM, because they were expressly contemplated by the Agreements.

68.     In addition, as set forth above, CM had a reasonable expectation of obtaining substantial revenue for its assets from an acquisition of its assets, which revenues would include a significant component attributable to the value created by the Agreements.  CM informed ClubCom of its efforts to obtain such investments.

69.     Counterdefendants' conduct as alleged herein was wrongful, for the reasons alleged herein.  Such conduct was intended to, and did, interfere with CM's ability to realize economic gain from such transactions and impede CM's ability to enter into new agreements with advertisers in health club facilities and to expand the advertising revenues it would receive. As a result of ClubCom's actions, as set forth herein, ClubCom intentionally attempted to thwart, and did thwart, CM's efforts to realize on the enterprise value of its company assets.

70.     As a result of Counterdefendants' unlawful interference with such prospective economic opportunities, CM has been damaged in an amount in an amount to be proven at trial, but not less than $12 million.

71.     In interfering with the foregoing economic opportunities, Counterdefendants were guilty of fraud, oppression and malice, and outrageous conduct, and CM is entitled to an award

of exemplary damages in an amount sufficient to punish Counterdefendants and make an example of them.

## FIFTH CLAIM

## CONVERSION

(Against All Counterdefendants)

72.    CM incorporates by reference Paragraphs 1 through 71, as though set forth fully herein.

73.    As set forth above, on or about March 7, 2006, CM delivered to ClubCom an advance of $1,000,000 against royalties to be earned by ClubCom under the Agreements. Between that date, and ClubCom's purported "termination" of the Agreements, ClubCom earned $92,083.87 in royalties under the Agreements.  The remaining $907,916.13 of CM's $1,000,000 royalty advance (the "Unearned Royalty Advance") constitutes CM's property, possession of which CM is entitled.

74.    The Unearned Royalty Advance has been retained by ClubCom and, CM is informed and believes and based thereon alleges, distributed among the various Counterdefendants.  Thus, Counterdefendants have converted this property to their own use.

75.    Counterdefendants' conduct in relation to CM's funds clearly evidences a theft and conversion.  Further, ClubCom represents that it has no further obligation to CM; thus, any formal demand for the return of CM's property would be futile.

76.    As a proximate result of Counterdefendants' wrongful conversion and retention of the Unearned Royalty Advance, CM has been damaged in an amount to be proven at trial, but not less than $907,916.13.

77.    In addition, pursuant to California Civil Code section 3336, CM is entitled to "fair compensation for the time and money properly expended" in pursuit of the Unearned Royalty Advance, which amount will be proven at trial.

78.    Counterdefendants' theft and conversion of the Unearned Royalty Advance has been willful, wanton, outrageous, malicious and oppressive, and undertaken with a specific intent to harm CM, which justifies the award of exemplary and punitive damages in an amount appropriate to punish Counterdefendants for their tortious conduct.

## SIXTH CLAIM

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

(Against All Counterdefendants)

79.    CM incorporates by reference Paragraphs 1 through 78, as though set forth fully herein.

80.    Counterdefendants' conduct, as herein alleged, constitutes unlawful, unfair and fraudulent business acts and practices and violate Business and Professions Code Section 17200 in the following respects:  Counterdefendants' practice of interfering with CM's efforts to secure an acquisition of its assets, and their theft and conversion of the Unearned Royalty Advance, is toritious conduct and, consequently, constitutes an unfair business practice within the meaning of Business and professions Code Section 17200.

81.    As a result of the conduct, CM has suffered injury in fact and lost money, including the loss of the economic benefits under the Agreement, the failure to realize the full value of the sale of its assets, and the more than $900,000 of CM's funds that Counterdefendents continue to hold.

82.    Counterdefendants' unfair competition should be enjoined, and the Court should make such orders or judgments as may be necessary to prevent Counterdefendants' use or employment of such acts and practices. In addition, CM is entitled to return of the money that Counterdefendants have received in connection with the Agreements.

## SEVENTH CLAIM

## UNJUST ENRICHMENT

(Against All Counterdefendants)

83.    CM incorporates by reference Paragraphs 1 through 82, as though set forth fully herein.

84.    Counterdefendants have been unjustly enriched, in an amount to be proven at trial but not less than $907,916.13, by their wrongful retention of the Unearned Royalty Advance and revenues which Counterdefendants have received or will receive from placing national advertisements on the ClubCom Network in derogation of the exclusive license granted to CM to receive such revenues.

## EIGHTH CLAIM

## FOR AN ACCOUNTING

(Against All Counterdefendants)

85.    CM incorporates by reference Paragraphs 1 through 84, as though set forth fully herein.

86.    CM is entitled to the distribution of substantial sums of money as a result of Counterdefendants' wrongful retention of the Unearned Royalty Advance and of revenues which Counterdefendants have received or will receive from placing national advertisements on the ClubCom Network in derogation of the exclusive license granted to CM to receive such revenues.  CM does not know the exact amount of the amounts to which it is entitled, and is unable to determine the amount, as Counterdefendants have not accounted for such funds.

87.    Accordingly, CM is entitled to an accounting from Counterdefendants of their business activities and costs associated therewith.

## NINTH CLAIM

## DECLARATORY RELIEF

### (Against All Counterdefendants)

88.     CM incorporates by reference Paragraphs 1 through 87, as though set forth fully herein.

89.     An actual controversy has arisen and now exists between CM and Counterdefendants concerning their respective rights and duties with respect to the Agreements in that CM contends that the Agreements remain in full force and effect, that CM has an exclusive right to sell national advertisements over ClubCom's Network, and that CM has not committed any material breach of the Agreements.  Counterdefendants dispute each of these contentions.

90.     A judicial declaration is necessary and appropriate at this time in the circumstances in order that CM may ascertain its rights and duties under the License Agreement and the Letter Agreement and facilitate its realization of its enterprise value.

91.     CM seeks a declaration stating, along with anything else deemed appropriate by the Court, that the License Agreement and the Letter Agreement remain in full force and effect and that it has not committed any material breaches of such Agreements.

## TENTH CLAIM

## IMPOSITION OF A CONSTRUCTIVE TRUST

### (Against All Counterdefendants)

92.     CM incorporates by reference Paragraphs 1 through 91, as though set forth fully herein.

93.     Counterdefendants hold, in constructive trust, the Unearned Royalty Advance, all revenues received from national advertisements over the ClubCom Network in violation of the exclusive license granted to CM.

94.     Accordingly, CM is entitled to an order requiring Counterdefendants to disgorge such funds, and all revenues and assets derived therefrom.

Wherefore, CM prays for relief as follows:

### On the First and Second Claims

1.     For compensatory damages an amount to be proven at trial, but not less than $40 million, plus interest at the legal rate according to proof;

### On the Third, Fourth and Fifth Claims

2.     For compensatory damages an amount to be proven at trial, but not less than $40 million, plus interest at the legal rate according to proof;

3.     For punitive damages in an amount sufficient to punish Counterdefendants and to make an example of them;

### On the Sixth and Seventh Claims

4.     For an Order requiring Counterdefendants to disgorge the funds they have received from CM and all advertising revenues and other monies Counterdefendants have received in violation of CM's exclusive license to place national advertisements on the ClubCom Network, and all funds derived therefrom;

### On the Eighth Claim

5.     For an accounting of the proceeds Counterdefendants have received from CM and of all advertising revenues and other monies Counterdefendants have received in violation of CM's exclusive license to place national advertisements on the ClubCom Network, and all fund derived therefrom;

### On the Ninth Claim

6.     For a judicial declaration that the License Agreement and the Letter Agreement remain in full force and effect and that CM has not materially breached either agreement;

**On the Tenth Claim**

7.     For the imposition of a constructive trust of the proceeds Counterdefendants have received from CM and of all advertising revenues and other monies Counterdefendants have received in violation of CM's exclusive license to place national advertisements on the ClubCom Network, and all fund derived therefrom.

**On all Claims:**

1.     For a preliminary and permanent injunction requiring Counterdefendants to refrain from (a) discontinuing advertisements CM placed on ClubCom's Network, prior to their scheduled termination dates; (b) refusing advertising insertion orders placed by CM for advertisements over ClubCom's Network in accordance with the License Agreement; (c) depriving CM of access to the portions of ClubCom's website that provide playback reports for existing advertisements; and (d) accepting national advertisements over the ClubCom Network, except for advertisements placed by CM.

2.      For CM's attorneys' fees and costs of suit incurred herein; and

3.      For such other and further relief as the court deems just and proper.

Dated:  May 22, 2008                              Respectfully submitted,
                                                  STRASSBURGER McKENNA GUTNICK &
                                                  GEFSKY


                                                  By:/s/ David A. Strassburger
                                                      David A. Strassburger
                                                      Pa. I.D. No. 76027

                                                      Four Gateway Center, Suite 2200
                                                      444 Liberty Avenue
                                                      Pittsburgh, PA 15222
                                                      (412) 281-5423

                                                      Counsel for Defendant and
                                                      Counterclaimant

                                                  **JURY TRIAL DEMANDED**

Louis P. Petrich
Vincent Cox
Leopold, Petrich & Smith,
A Professional Corporation
2049 Century Park East, Suite 3110
Los Angeles, California  90067
Tel:   (310) 277-3333
Fax:  (310) 2777-7444
Email:  lpetrich@lpsla.com
          vcox@lpsla.com
Attorneys for CM SHAREHOLDER
HOLDINGS, INC., f/k/a CAPTIVE MEDIA,
INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **ANSWER AND COUNTERCLAIMS** was served by CM/ECF, this 22ND day of May, 2008, on the following:

Susan A. Yohe, Esquire
Stanley J. Parker, Esquire
Buchanan Ingersoll & Rooney, PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219

Michael D. Wexler, Esquire
J. Scott Humphrey, Esquire
Seyfarth Shaw, LLP
131 S. Dearborn Street, Suite 2400
Chicago, IL 60603

STRASSBURGER McKENNA GUTNICK
& GEFSKY

By: /s/ David A. Strassburger
      David A. Strassburger
      Pa. I.D. No. 76027

      Four Gateway Center, Suite 2200
      444 Liberty Avenue
      Pittsburgh, PA 15222
      (412) 281-5423
      (412) 281-8264 (Fax)

      Counsel for Defendant

      **JURY TRIAL DEMANDED**