IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLUBCOM, LLC f/k/a CLUBCOM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 2: 07-cv-01462 |
| v. | ) | |
| | ) | |
| CAPTIVE MEDIA, INC., d/b/a HEALTH CLUB PANEL NETWORK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| CM SHARHOLDER HOLDINGS, INC., f/k/a CAPTIVE MEDIA, INC., d/b/a HEALTH CLUB PANEL NETWORK, a California Corporation, | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CLUBCOM, LLC f/k/a CLUBCOM, INC., a Delaware Corporation, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

September 20, 2010

Presently pending before the Court for disposition are the following:

• MOTION FOR SUMMARY JUDGMENT, AND, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES, with brief in support, filed by CM Shareholder Holdings, Inc., f/k/a Captive Media, Inc. d/b/a Health Club Panel Network ("CM") CM (*Sealed Document Nos. 171 and 172*); the OPPOSITION to CM's Motion for Summary Judgment filed by ClubCom, LLC f/k/a ClubCom, Inc. ("ClubCom") (*Sealed Document No. 188*); and the REPLY BRIEF filed by CM (*Sealed Document No. 196*); and

• MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by ClubCom, in which ClubCom seeks summary judgment on its breach of contract claims and dismissal of the counterclaims for breach of contract and breach of implied duty of good faith (*Sealed Document Nos. 175 and 176*); the OPPOSITION to Clubcom's Motion for Summary Judgment filed by CM (*Sealed Document No. 185*); and the REPLY MEMORANDUM OF LAW filed by ClubCom (*Sealed Document No. 197*).

The issues have been fully briefed and the factual record has also been thoroughly developed via CM'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, AND, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES (*Sealed Document No. 173*), CM'S APPENDIX IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT (*Sealed Document No. 174*), THE RESPONSIVE CONCISE STATEMENT OF UNDISPUTED MATERIALS FACTS filed by CLUBCOM (*Sealed Document No. 189*), APPENDIX OF DOCUMENTS REFERENCED IN CLUBCOM'S RESPONSIVE CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS, VOL. I (*Sealed Document No. 190*); APPENDIX OF DOCUMENTS REFERENCED IN CLUBCOM'S RESPONSIVE CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS, VOL. II (*Sealed Document No. 191*), CLUBCOM'S STATEMENT OF UNDISPUTED MATERIAL FACTS (*Sealed Document No. 177*), APPENDIX OF DOCUMENTS REFERENCED IN CLUBCOM'S STATEMENT OF UNDISPUTED MATERIAL FACTS VOL. I and VOL. II (*Sealed Document No. 178*), CM'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO CLUBCOM'S MOTION FOR SUMMARY JUDGMENT (*Sealed Document No. 186*), and CM'S APPENDIX IN SUPPORT OF OPPOSITION TO CLUBCOM'S MOTION FOR SUMMARY JUDGMENT (*Sealed Document No. 187*).

After an indepth and careful consideration of the motions, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that due to the prevalence of disputed issues of material fact, the breach of contract claims advanced by both parties must be submitted to the fact finder for final determination. However, the Court finds that the gist of the action doctrine bars ClubCom's claims for tortious interference with contractual relations and tortious interference with a valid business expectancy and, thus, CM's motion for summary judgment will be granted in part.

## PROCEDURAL BACKGROUND

All of the claims and counterclaims, and the basic issues of this lawsuit, flow from the parties' March 7, 2006 Advertising License Agreement, together with a supplemental Letter Agreement.

ClubCom initiated this lawsuit on November 14, 2007, by the filing of a four-count Complaint against CM in which it alleges that CM breached the long term License Agreement between the parties which gave CM the exclusive right to place national advertising on the digital entertainment network developed and operated by ClubCom.[1] Distilled to its essence, ClubCom alleges that during the long term license relationship, CM was selling a "competing" network and that, as a result, it failed to use its "best efforts" to perform its responsibilities under the License Agreement.

On December 21, 2007, CM filed a Motion to Dismiss for Improper Venue Or, In The Alternative, to Transfer. Thereafter, the parties engaged in three months of discovery limited to matters relating only to the issue of whether CM was subject to personal jurisdiction in

---

[1] ClubCom seeks a Declaratory Judgment (Count I), and alleges Breach of Contract (Count II), Tortious Interference with Contractual Relations (Count III), and Tortious Interference with a Valid Business Expectancy (Count IV).

the Western District of Pennsylvania and whether the United States District Court for the Western District of Pennsylvania was the proper venue for the litigation.

By Memorandum Opinion and Order dated May 9, 2008, the Court denied CM's Motion. On May 22, 2008, CM filed its Answer to the Complaint and a ten-count Counterclaim against ClubCom, Amer Sports Oyj a/k/a Amer Sports Corporation; and Precor, a wholly owned subsidiary of AmerOyj. ClubCom is a wholly-owned subsidiary of Precor and, in turn, of AmerOyj.[2] Approximately one month later, CM filed a First Amended Counterclaim which named Amer Sports Co., another wholly-owned subsidiary of AmerOyj, as an additional counterclaim defendant. The counterclaim defendants thereafter filed Motions to Dismiss seeking to dismiss Claims Three through Ten of the First Amended Counterclaim. Counts I and II of the Amended Counterclaim, which were directed solely to ClubCom, were not the subject of the motions to dismiss. By Memorandum Opinion and Order filed January 31, 2009, the Court granted the Motions to Dismiss and dismissed Precor, Inc., Amer Sports Company, and Amer Sports OYJ a/k/a Amer Sports Corporation as counterclaim defendants in this action.

On March 3, 2009, CM filed a Second Amended Counterclaim in which it named only ClubCom as a counterclaim defendant and alleged the following two claims: Breach of Written Contract (First Claim), and Breach of Implied Covenant of Good Faith and Fair Dealing (Second Claim).

---

[2] In its Counterclaim, CM alleged Breach of Written Contract (First Claim), Breach of Implied Covenant of Good Faith and Fair Dealing (Second Claim), Interference with Contractual Relations (Third Claim), and Interference with Prospective Economic Advantage (Fourth Claim), Conversion (Fifth Claim), Violation of California Business and Professions Code Section 17200 Sixth Claim), Unjust Enrichment (Seventh Claim), For an Accounting (Eighth Claim), Declaratory Relief (Ninth Claim), and Imposition of a Constructive Trust (Tenth Claim).

## BACKGROUND

Plaintiff / Counterclaim Defendant ClubCom is engaged in the business of developing and operating customized digital entertainment networks, which it broadcasts in health clubs and bowling alleys throughout the United States, the United Kingdom, Germany, Japan, and Australia. ClubCom offers patrons of health clubs an ambient (i.e., using sound that fills the room) television entertainment network that operates on a programming schedule similar to conventional television, which includes permitted advertising for several minutes of each hour.

Defendant, Counterclaimant CM is an advertising company engaged in the business of selling advertising and promotional campaigns to health clubs and other entities within the fitness industry. The "cornerstone" of CM's business model has been its "static display platform, which involves the placement of attractively framed advertising posters in the highly-trafficked areas of clubs." *See* Exhibit 5 - Health Club Panel Network Information Memorandum at 5.

On March 7, 2006, following over a year of extensive negotiations, ClubCom and CM entered into a "License Agreement," pursuant to which ClubCom granted CM an exclusive license to sell national advertising over the ClubCom network[3] for ten and a half years, together

---

[3] "Network" is defined in the License Agreement as follows: "any ClubCom entertainment and/or advertising network broadcast in Facilities, and includes the software components and hardware components used by ClubCom for transmitting or receiving Content and advertising broadcasts (including but not limited to the servers, monitors, speakers, and any other audio, visual or audio-visual equipment, digital signage and software). The Network includes but is not limited to all advertising rights granted to ClubCom under any Program Agreement. The Network shall also include other forms of entertainment Content, advertising, additional channels and multi-channel broadcasts over the Network as the programming evolves. The Network shall not include the delivery, transfer and/or management of equipment data, user physiological data or such other data that is transferred and/or managed by Precor's In-Site™ programming or similar equipment / user programming networks. License Agreement, ¶ 1.

with a right of first refusal to acquire ClubCom if it received a buyout offer. It also granted CM a non-exclusive license to introduce and promote the ClubCom Network to health clubs. In return, CM paid ClubCom a royalty advance of $1 million to be offset against ClubCom's future royalties, and agreed to pay additional capital expenses on an agreed schedule. CM further agreed to use its "best efforts" to "market, promote, commercialize and sell [advertisements] over the [ClubCom] Network" and "install, operate and commercialize the [ClubCom] Network in new facilities and in facilities with which CM had a pre-existing business relationship." The "best efforts" clause is a material provision of the License Agreement. *Id*. at § 10.

CM also agreed to "not directly or indirectly compete with ClubCom" in any health club and not to promote or recommend within the fitness industry[4] any network operation products that are competitive with or similar to the ClubCom Network. CM further agreed not to interfere in any way with ClubCom's relationship with any Facility and to keep confidential all of ClubCom's trade secrets and proprietary and confidential information.

Contemporaneously with the execution of the License Agreement, on March 7, 2006, CM and ClubCom also executed a separate "Letter Agreement Regarding [CM] Facilities," (the "Letter Agreement") which provides with respect to "Current [CM] Facilities," that:

> During the Term [of the License Agreement] Captive will use best efforts to secure from Current Captive Facilities in the United States and Canada the right for ClubCom to install, operate and commercialize the Network, and Captive to receive broadcasting advertising rights pursuant to terms and conditions that are mutually acceptable to ClubCom and Captive . . . . Should ClubCom elect to install the Network, ClubCom shall use commercially reasonable efforts to install,

---

[4] "Fitness Industry" is defined in the License Agreement as follows: "organizations and/or facilities offering fitness services including but not limited to health clubs, health recreation centers, governmental establishments, medical service providers, hotels, and the like." License Agreement, ¶ 1.

operate and commercialize the Network in a manner comparable to operational standards applicable to [ClubCom] Facilities . . . .

Exhibit 8, Letter Agreement, § 1.

ClubCom contends that CM breached the License Agreement because CM was actively promoting a competing product; CM denies this contention and argues that CM never promoted a competing product and that it always used its best efforts to market, promote and sell advertisements on the ClubCom Network. CM argues that ClubCom's motion for summary judgment should be denied as no reasonable jury could determine that CM's solicitation of its VODS[5] product constituted a material breach. In the alternative, CM argues that if the solicitation of its VODS product constituted a breach, such breach was curable as CM could have withdrawn the offers and notices could have been sent that would have cured any claimed breach within the sixty (60) days cure period prescribed by the License Agreement.

In turn, CM alleges that it is entitled to summary judgment because no claim for breach of contract can be sustained against a party that has a right to cure, unless the party was given the opportunity to cure or the breach is provable to be incurable. Additionally, CM alleges that the gist of the action doctrine should bar ClubCom's claims for tortious interference with contractual relations and tortious interference with a valid business expectancy.

The relationship history between the parties to this breach of contract lawsuit is lengthy and contentious. The Court has noted on numerous occasions the considerable tension between the respective parties and their attorneys.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions,

---
[5] "VODS" is the acronym used by CM for its video-only digital signage product.

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986) (internal quotation marks omitted).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id*. at 247-48. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, *i.e.,* the material facts, however, will preclude the entry of summary judgment. *Id.* at 248. Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. It is on this standard that the Court has reviewed the motions and responses filed by the parties.

## DISCUSSION

A.  Breach of Contract Claims

At the heart of this dispute is the allegation of ClubCom that CM materially breached the non-compete provision of the License Agreement by having developed its HCPN-DB ("HCPN") network which, according to ClubCom, was being utilized to market a competing product, specifically CM's video-only digital signage product ("VODS"). ClubCom also contends that by marketing the VODS product, CM breached its "best efforts" obligation under the License Agreement. ClubCom contends that CM's actions constituted an incurable breach of contract and, thus, it was entitled to immediate termination of the License Agreement.

CM responds that it did not materially breach the License Agreement because its VODS product was not a competitive product to ClubCom's ambient audiovisual entertainment network and that the License Agreement between the parties provided CM with "the unambiguous, express right" to install the first four VODS screens in every single club that had a contract with ClubCom. In addition, CM contends that it made clear to ClubCom, even while the parties were negotiating the License Agreement, that it wanted to develop and offer a VODS product. CM contends that the HCPN-DB brand "was developed immediately after the License Agreement was entered into in 2006, with ClubCom's full knowledge and consent, as a means for CM to use its best efforts to market digital advertising by showing continuity with the past (HCPN) and evolution to the future (-DB)." Further, CM contends that ClubCom did not object to CM's work in developing, promoting or installing VODS until the filing of this lawsuit. *See* Declaration of Mark Bianchi, at ¶ 11.

A central controversy in this case involves the interpretation of Paragraph 4(e) of the License Agreement, which is entitled "video-only signage," and provides as follows:

> e. Video-Only Signage. ClubCom may have the right under certain Program Agreement to install electronic signs dedicated to receive video-only transmitted through the Network, including specifically the technology of digital signage ("Digital Signs"). To the extent [CM] requests and the Facility elects to permit the installation of Digital Signs, then for the purpose of commercializing Licensed Advertisements over the Network, [CM] shall be entitled to install, at [CM's] expense [subject to a capital expenditures formula] . . . the first four (4) Digital Signs monitors permitted to be installed and shall have no right to install the next three (3) Digital Signs monitors permitted to be installed . . . [CM] shall have no obligation to pay for any of the Digital Signs for which it has no right to install. [CM] agrees that it will not repurpose any of the existing screens within a Facility that currently broadcast the Network for the purpose of broadcasting video-only Advertising without the prior written consent of the Facility.

> Independent of the above allocations for Digital Signs, ClubCom reserves the right to directly negotiate with each Facility for the installation of Digital Signs for the broadcast of Amer Advertisements.

License Agreement, at ¶ 4(e) (emphasis added).

CM argues that Paragraph 4(e) provides that it, not ClubCom, has the right to install VODS monitors in the ClubCom clubs. Further, according to CM, Paragraph 4(e) specifically provides that ClubCom has no right to install VODS in any of its clubs until CM has exercised its right to install the first four VODS signs in such clubs. Further, CM argues that as long as it did not violate the competitive restrictions of the License Agreement or the Letter Agreement, CM had the right to install VODS in non-ClubCom health clubs.

ClubCom responds that "[t]o the extent the License Agreement gave [CM] any right to install digital monitors, that right was very narrowly designed" and CM did not have the "unfettered right to install digital signage independent of ClubCom and in direct competition."

ClubCom also argues that Paragraph 4(e) of the License Agreement cannot be read in such a way as to avoid the non-competition provisions set forth in Paragraph 10 of the License Agreement:

> 10. Business Restrictions. . . . [CM] further agrees that during the Term of this Agreement that it will not directly or indirectly compete with ClubCom in any Facility provided that [CM] shall be permitted to engage in the selling and commercialization of static billboards, print and product sampling programs.

License Agreement, ¶ 10. Interestingly, as CM points out, Paragraph 10 of the License Agreement also states that "[i]f at any time during the Term of this Agreement [CM] represents or provides any form of services which are competitive with the Network to more than 200 Non-ClubCom Locations (<u>other than for the selling and commercialization</u> of static billboards, print, product sampling, promotions and <u>digital signage</u>), then ClubCom shall be entitled to receive

20% of all revenues received by [CM] through such representation or services . . . ." (License Agreement, ¶ 10, emphasis added).

The cross-motions for summary judgment on the breach of contract claims require the Court to determine whether a breach occurred, when it occurred, which party committed the breach, and whether the breach was material. However, the Court finds that it cannot make these determinations at the summary judgment stage as the contract is ambiguous on the key issue of digital signage and because there are material issues of fact in dispute. Thus, the respective motions of the parties will be denied.

When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous. *Nw. Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del. 1996). Contracts are ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992). Stated differently, to succeed on a motion for summary judgment, the moving party must establish that its construction of the contract is the <u>only</u> reasonable interpretation.

Upon review of the applicable contract provisions, the suggested meanings contended by the parties, and the nature of the objective evidence offered, or lack thereof, the Court finds that the provisions related to digital signage are fairly susceptible to reasonable alternative interpretations. The nature of the extrinsic evidence offered does not provide objective indicia for the Court to determine the intentions of the parties. Because the contract provisions are indefinite and susceptible to reasonable alternative meanings, it is for the jury to

determine their meaning. Accordingly, the cross-motions for summary judgment on the breach of contract claims will be denied.

Assuming, however, that the Court had determined, as a matter of law, that the contract was clear and unambiguous, summary judgment would still not be appropriate as to whether either party materially breached the contract. For a breach to be material, it must "go[] to the essence of the contract." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc*., 263 F.3d 296 315 (3d Cir. 2001). It must be "of sufficient importance to justify non-performance by the non-breaching party." *Biolife Solutions, Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

Whether the breach of a contract is material is generally an issue of fact. As our appellate court has noted when determining whether a breach of contract is material is "inherently problematic" at the summary judgment stage. *See Norfolk S. Ry. Co. v. Basell USA Inc.,* 512 F.3d 86, 96 (3d Cir. 2008) (applying factors of Restatement (Second) of Contracts § 241). Although such a determination is not impossible, our court of appeals has recognized that it is particularly difficult where "the materiality analysis may well turn on subjective assessments as to the state of mind of the respective parties." *Id.*

In this case, even if the Court were to have determined that CM breached the contract as a matter of law, the materiality determination would still best be left to the trier of fact. The dispute over materiality in this case is mired in subjective assessments as to the "understanding" and "expectations" of the parties, as reflected in the numerous emails and deposition testimony upon which the parties respectively rely.

Moreover, a fundamental factual issue exists as to whether the VODS product was competitive with that of the ClubCom Network. ClubCom's expert, Charles R. Taylor, Ph.D., opines, *inter alia,* that "[CM] marketed and promoted a network that clearly competes

with the ClubCom network, . . . , [and] that the distinction that [CM] personnel attempt to draw between a digital broadcast system, which they say is not digital, and RSS systems / digital signage is inconsistent with accepted definitions of digital signage."

CM responds that "VODS and ClubCom's audiovisual system had different functions, required different software and hardware, had different video screens, with ClubCom's addressing large groups of club members with audio and video, and CM's displays using a divided screen showing content and ads simultaneously displayed without sound and placed in locations where individuals and very small groups would view it." In support of its position, CM has produced evidence that health clubs regarded VODS as complimentary, not competitive, to the ClubCom Network. For example, in his Declaration, Bryan Gauch, the Director of Business Development for Sport & Health, Inc., states that "[f]rom his perspective, the two companies' offerings are not competitive, they are complimentary. . . . The products attract their audience in different ways. Soundless digital signage, like advertising panels, has an effective range limited by people's ability to read the video screen. ClubCom's offerings use sound and are more like MTV entertainment, combined with ads and internal club program promotions. . . . Because to me, the products have different functions, I chose both to work hand in hand with me for the clubs." *See* Exh. F, App. in Support of CM's Mot. for Summ. J.

Likewise, in his deposition, John G.J. Janszen, Executive Vice President and Chief Operating Officer for Fitworks, LLC, testified that the HCPN panels serve a different function from the ClubCom panels. "When the music video is on, it plays throughout the club; whereas, the Health Club Panel Network display is silent. Health Club Panel Network shows time and weather. We don't show that on ClubCom. And in ClubCom, we run ClubCom commercials that are customer service-oriented, which we don't -- which is not available on

Health Club Panel Network. Those are three main functions that are different." *See* Exh. H, App. in Support of CM's Mot. for Summ. J. The determination of whether CM's VODS product is competitive to the ClubCom Network is most appropriately left for a trier of fact to decide.

There is also a genuine issue of material fact regarding whether CM failed to use its best efforts in promoting the ClubCom Network. The determination of best efforts is also most appropriately made by a trier of fact.

Finally, CM argues that if it did materially breach the License Agreement, Paragraphs 12.d and 25 of the License Agreement provide a 60-day notice and cure provision. According to CM, because ClubCom terminated the License Agreement without offering CM an opportunity to cure any alleged violation of the License Agreement, ClubCom's breach of contract claim cannot be sustained. Furthermore, CM counterclaims that ClubCom's covenant of good faith and fair dealing was breached by its failure to permit CM to cure.

ClubCom strongly disputes that CM's breaches were curable because, according to ClubCom, the breaches "went to the heart of the contract; they destroyed the relationship of trust and confidence that was a prerequisite to the contract and because [CM] entered into contracts with third parties that it could not walk away from." CM replies that as of November 14, 2007, it had installed VODS in only five (5) health clubs on a beta-testing basis. It also had another "demonstration" club in New York, which was a test club to test software prior to the beta test. Prior to November 14, 2007, no advertising had been offered to advertisers or advertising agencies for placement on any CM VODS sites in any health clubs. CM argues that had ClubCom provided it with notice of the alleged breaches, it would have attempted to speak with ClubCom about what it wanted done and would have attempted to "cure" any alleged problem. In fact, according to CM, it could have withdrawn any offers and notices could have

been sent that would have cured any claimed breach within the sixty (60) days permitted by the License Agreement.

Given the material factual disputes that exist, the Court finds that the issue of whether CM should have had the opportunity to cure any alleged breach is a factual determination not appropriate for adjudication as a matter of law at the summary judgment stage.

All of the foregoing issues of material fact are far from settled and are plainly disputed. Therefore summary judgment is not appropriate as these factual determinations should be determined by a trier of fact.

B.    ClubCom's Claims for Tortious Interference with Contractual Relations (Count III) and Tortious Interference with a Valid Business Expectancy (Count IV)

CM requests the Court to grant summary judgment in its favor on Counts III and IV of ClubCom's Complaint because such claims should be barred by the gist of the action doctrine. "The gist of the action doctrine bars tort claims which arise solely from a contract between the parties." *Werwinski v. Ford Motor Co.,* 286 F.3d 661, 680 n.8 (3d Cir. 2002).

In Count III of its Complaint, ClubCom alleges that "[CM's] intentional and unjustified inducement of Facilities and/or potential ClubCom clients to terminate their contracts and/or business relationships with ClubCom, and/or refrain from conducting business with ClubCom, was and is a breach of the Agreement." Complaint, at ¶ 98 (emphasis added). Given the specific language of the Complaint, it appears undeniable that the claims of ClubCom for tortious interference with contractual relations are materially interwoven with the terms of the License Agreement.

Likewise, in Count IV of its Complaint, ClubCom alleges that CM "intentionally and unjustifiably interfered with ClubCom' (sic) valid business expectations by, among other

things, attempting to induce Facilities, Captive Current Facilities, Captive Future Facilities and non-ClubCom Facilities to not do business with ClubCom and by making false and misleading representations about the ClubCom Network and HCPN-DB." Again, the Court observes that the Count IV claims are materially interwoven with the contract claims.

For these reasons, the Court finds that the claims of ClubCom in Count III and Count IV of its Complaint are indeed barred by the gist of the action doctrine.

## CONCLUSION

For all the aforementioned reasons, the Court finds that genuine disputes of material fact(s) exist which preclude summary judgment on the breach of contract claims brought by each of the parties.

However, the Court has determined that the gist of the action doctrine is applicable to bar the claims of ClubCom for tortious interference with contractual relations and tortious interference with a valid business expectancy. Thus, the motion for summary judgment filed by CM will be granted in part.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CLUBCOM, LLC f/k/a CLUBCOM, INC., | ) | |
| | ) | |
| Plaintiff, | ) | 2: 07-cv-01462 |
| v. | ) | |
| | ) | |
| CAPTIVE MEDIA, INC., d/b/a HEALTH CLUB PANEL NETWORK, | ) ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| CM SHAREHOLDER HOLDINGS, INC., f/k/a CAPTIVE MEDIA, INC., d/b/a HEALTH CLUB PANEL NETWORK, a California Corporation, | ) ) ) ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLUBCOM, LLC f/k/a CLUBCOM, INC., a Delaware Corporation, | ) ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## ORDER OF COURT

**AND NOW,** this 20th day of September, 2010, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. The MOTION FOR SUMMARY JUDGMENT, AND, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES filed by CM Shareholder Holdings, Inc., f/k/a Captive Media, Inc. is **GRANTED IN PART** and **DENIED IN PART**;

2. The Court has determined that the gist of the action doctrine bars the claims of ClubCom for tortious interference with contractual relations (Count III) and tortious interference with a valid business expectancy (Count IV) and, therefore, same are **DISMISSED** with prejudice;

17

3. The MOTION FOR SUMMARY JUDGMENT filed by ClubCom, LLC is **DENIED.**

It is further **ORDERED** that ClubCom shall file a Pretrial Statement on or before **October 18, 2010** and CM shall file a Pretrial Statement on or before **November 15, 2010**.

It is further **ORDERED** that a pretrial conference in this matter is scheduled on **November 22, 2010 at 1:30 P.M**. in Courtroom 6C, U.S. Courthouse, 700 Grant Street, Pittsburgh, PA 15219.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc: Diane M. Nardi, Esquire
Brown Rudnick LLP
Email: dnardi@brownrudnick.com

Emilio A. Galvan, Esquire
Brown Rudnick LLP
Email: egalvan@brownrudnick.com

Martin S. Siegel, Esquire
Brown Rudnick LLP
Email: msiegel@brownrudnick.com

Susan A. Yohe , Esquire
Buchanan Ingersoll
Email: susan.yohe@bipc.com

David A. Strassburger, Esquire
Strassburger, McKenna, Gutnick & Gefsky
Email: dstrassburger@smgglaw.com

Jamie L. Frieden, Esquire
Leopold, Petrich & Smith
Email: jfrieden@lpsla.com

Louis P. Petrich, Esquire
Leopold, Petrich & Smith, P.C.
Email: lpetrich@lpsla.com

Vincent Cox , Esquire
Leopold, Petrich & Smith
Email: vcox@lpsla.com